Joe C. **DELFORGE** and wife, Juanita Delforge, and Charles K. Edmonds and wife, Joel T. Edmonds, Complainants-Appellees,

v.

Otis D. **McMURTRY** and wife, Naomi C. McMurtry, Defendants-Appellants.

Court of Appeals of Tennessee, Middle Section.

Jan. 7, 1972.

Certiorari Denied by Supreme Court June 5, 1972.

Cheatham & Cheatham, Pulaski, for complainants-appellees.

T. Edward Sisk, of Willis, Knigh & Barr, Nashville, for defendants-appellants.

## OPINION

PURYEAR, Judge.

This is an action to recover for an acreage deficiency in the sale of a farm. In their bill of complaint the complainants allege a deficiency of fifty-eight acres in the sale of a certain tract or parcel of land represented to contain 217.5 acres situated in the 12th Civil District of Giles County, Tennessee, which was sold and conveyed to

them by the defendants by deed dated June 4, 1969.

In their bill of complaint, the complainants pray for a rescission of the contract of sale, or in the alternative, a reformation thereof and abatement of the purchase price, and for general relief.

The case was tried before the Honorable W. A. Harwell, Circuit Judge, sitting as Chancellor, without intervention of a jury, upon oral testimony and documentary evidence, as a result of which trial the trial Court refused to grant a rescission of the contract of sale but granted a reformation thereof and an abatement of the purchase price to the extent of $13,813.28, for which amount a decree was rendered in favor of complainants and against the defendants, together with the cost of the cause.

To the action of the trial Court in sustaining the bill and awarding a recovery in the amount of $13,813.28, the defendants excepted and prayed and perfected an appeal to this Court.

To the action of the Court in refusing to grant a rescission of the contract of sale, the complainants excepted and prayed and perfected an appeal to this Court.

However, the complainants have not filed any assignments of error and we conclude that they have abandoned their appeal.

The defendants have filed two assignments of error as follows:

I

"The court erred in awarding Appellees' damages in view of the court's finding that there was no fraud or misrepresentation on the part of the Appellants, or mutual mistake of fact upon which relief could be based. In the absence of fraud or misrepresentation or mutual mistake of fact, the facts do not otherwise support a finding of any liability on the part of Appellants.

II

In the event this Honorable Court sustains the court below as to the question of liability, Appellants would allege that the Chancellor erred in awarding the Appellees damages that were excessive and contrary to the evidence."

The material and determinative facts as disclosed by the record in this case are as follows:

In the early part of 1969 and for several years prior thereto the complainants lived in Denver, Colorado, although the Delforges had previously lived in Giles County, Tennessee.

In February of that year all four of them decided they would like to buy a farm in Tennessee and raise cattle on it. None of them had any previous experience in farming, raising cattle, or buying or selling farm land. For the purpose of raising cattle thereon they wanted a farm of at least 200 acres, believing they would need at least this much land.

At that time, Mr. McMurtry owned and lived on a farm in Giles County, Tennessee, known as "Sanders Lake" farm, which had a small lake on it. This farm originally consisted of what the defendants believed to be 262 acres. They had previously sold 44.5 acres to one Joe M. Walters and they therefore believed the remaining acreage to be 217.5.

In February, 1969, Mr. Edmonds and Mr. Delforge came to Giles County and contacted one Grady Bass, a real estate agent, and told him what they wanted to buy. Whereupon, Bass contacted Mr. McMurtry and learned that his farm, together with cattle and equipment thereon, were for sale.

At the suggestion of Bass, who had the property listed with him for sale, Mr. Edmonds and Mr. Delforge went to the McMurtry farm where they saw Mr. McMurtry and he showed them a plat of the farm as it was originally constituted before 44.5 acres thereof was sold to Walters.

In the center of this plat the following figures have been written:

"262 Acres
  44.5
 ──────
 217.5"

At that time, they looked at most of the farm but did not follow the course of the boundary lines due to the fact that Edmonds was recuperating from lung surgery and did not feel that he was able to do that much walking.

Also at that time, they made Bass an offer to purchase the farm, together with cattle and equipment, for $54,000.00 which offer was declined by Bass and they returned to Denver, Colorado.

Later, however, in February, 1969, Bass communicated with one of the complainants and all four of them came to Giles County and went to the farm. On this latter mentioned occasion, Mr. McMurtry loaned them his tractor and trailer and they drove around the farm, but no one familiar with the boundary lines accompanied them.

Also on the occasion of this trip to Giles County, the parties all agreed upon a purchase price of $72,000.00 for the farm, with all cattle and equipment thereon, of which amount $51,800.00 was finally agreed upon as the purchase price for the farm, the remaining amount to be paid for cattle and equipment.

At all times Bass represented to complainants that the farm contained 217 acres and he and the defendants believed that it did contain this much acreage.

Finally or or about February 23, 1969, the parties met in Bass's office where two contracts of sale were prepared, the first of which described the property being sold as follows: "217 acres more or less Sanders Lake property."

Although Mr. McMurtry, Mr. Edmonds and Mrs. Delforge signed this contract, Mr. Delforge objected to the words "more or less" and refused to sign the contract.

Therefore, a second contract was prepared and signed by Mr. Edmonds, Mr. Delforge and Mr. McMurtry which described the property to be sold as follows: "Sanders Lake 12th Civil District Giles Co. Tennessee consisting of 217 acres and all improvements plus tools, machinery and 108 cattle and described as per survey."

Bass described this incident in the following testimony:

"Q. You remember what happened there?

A. There was some question there by Mr. Delforge as to what 'more or less' really meant and I explained to him that deeds were usually written with that term 'more or less' and to be specific or exact, I didn't think that anyone could ascertain the exactness of a parcel of property, that is, considering the topography of the land, and that is what we normally say, but I told him that our rule that we had to go by, we usually allowed about 3%, it will vary about 3%, and I felt like as the Federal Land Bank, as they had a loan and they had a deed and as this deed, I was sure a title opinion had been run on this and they wouldn't have to worry, as far as acreage was concerned but he insisted on being exactly 217 acres, rather than 217 acres more or less." (Vol. 1, B. of E., pp. 136, 137)

Mr. Delforge described the same incident in the following testimony:

"Q. All right—now just explain to the Court—

Mr. Sisk—Just for my own clarification, which number is he talking about that he signed now at that time? 2 or 3?

Mr. Cheatham—the original is Exhibit No. 1 to Grady Bass, that Mr. Edmonds and Mr. Delforge signed and they agreed on, and the original No. 3, Grady Bass, is the one they finally agreed on, and that's the one that was signed, and the No. 3 of Grady Bass and Exhibit No. 6

to Edmonds are the same; and Exhibit No. 4 of Edmonds and Exhibit No. 1 of Grady Bass are the same.

Mr. Sisk—OK; I got it.

Mr. Cheatham—now, then, you just explain why you did not sign the first one; that's the one that doesn't have your signature.

A. Well, I had to be assured that we had 217 acres and I wasn't able to walk the farm, complete, and I just wanted to make sure we had it because we had to have it for what we were going into, and we were going to invest our life's earnings in this thing, and it was going to be slim pickings as it was, and I wanted to be sure we were right, and I'm not a surveyor.

Q. And the objection to No. 1 that it had 'more or less'—was that the objection?

A. Yes, sir.

Q. And then the second one, Exhibit No. 3 of Bass—

A. The 'more or less' was taken out.

Q. And that's the only material change between the two, as far as you know?

A. Yes, sir." (Vol. 2, B. of E. pp. 10, 11)

Due to the fact there was some delay in obtaining a loan for the purpose of financing the purchase, the deed to the property was not executed and delivered until about June 4, 1969. However, the defendants moved off the farm on April 15, 1969, and on that same date Mr. and Mrs. Edmonds moved thereon and were living there at the time the deed was delivered.

The deed was prepared by Mr. Tom W. Moore, an attorney of Pulaski, Tennessee, and it describes three tracts of land situated in Giles County, Tennessee, the first tract being described as containing 262 acres as per survey of James E. Sanders of January 21, 1964.

The second tract is described as containing 33.14 acres more or less, but it is conceded by the parties that this 33.14-acre tract was included in the deed by mistake and it was not intended to be conveyed.

The third tract is described as containing 44.5 acres more or less, and being the same land theretofore conveyed by defendants to Joe M. Walters et al and the deed recites that this tract is included within the boundaries of the first mentioned tract of 262 acres, but it is excluded from the conveyance and the description of the property is concluded as follows: "Thus, there is hereby conveyed by this instrument and intended to be conveyed a total of 217.50 acres more or less."

On the occasion when the deed was being prepared, Mr. Delforge noted that the description contained the qualifying words "more or less" and he explained his failure to insist upon this language being stricken from the deed by the following testimony:

"Q. Did you get the deed before you there at Mr. Moore's office?

A. Yes, sir.

Q. Was it read to you?

A. Yes, sir.

Q. Was this part read to you right here. I refer to the third page second paragraph?

A. Yes, sir.

Q. Read it to the Court.

A. 'There is hereby conveyed by this instrument and intended to be conveyed a total of 217.5 acres more or less'—I brought up this 'more or less' again there, and Mr. Moore said deeds in the State of Tennessee always quote the 'more or less.'

Q. Was there anything, any representation made to you at that time by anyone as to what 'more or less' meant?

A. Well, prior to that, the 'more or less' was brought up, which Mr. Grady Bass says meant a 3% variation, one way or the other.

Q. 3%?

A. Yes, sir.

Q. When was that representation made to you about the 3%?

A. I believe, sir, that that was at the time that we signed our contracts. Of course, it was also brought up again in the lawyer's office, the 3%." (Vol. 2, pp. 14, 15, B. of E.)

Also, while the parties were in Mr. Moore's office the complainants had occasion to see a tax receipt which showed that the property was listed upon the tax assessor's records as containing 153 acres, whereupon Mr. Moore explained this discrepancy to the complainants and his testimony about his explanation thereof is as follows:

"Q. Well, can you say what you thought about this tax deficiency acreage, on the tax books being 153 when you drew a deed for 217?

A. Yes, I can.

Q. All right—

A. It goes back to Mr. Ralph Freeman and Whit Beck and Mr. McMurtry, every time there was a transfer this thing would come up and nearly every year the trustee would tell the taxpayer how much taxes they owed, they would pay it and later they would get a notice that they owed a little something in the 9th Civil District—this has nothing to do with it except to say that there was always something about the taxes, and nearly every time that discrepancy came up, it was explained that Sanders Lake, Inc., at one time owned approximately 60 acres, and I said this, and many people said it before, that any discrepancy was expressed by the fact that that 60 acres was not picked up on the tax books as being Sanders Lake property, when as a matter of fact, I never remember the Sanders Lake property being on the tax books, and it was represented for quite some time by shares of stock, of course, people being what they are, if they didn't have to pay any taxes on a piece of property, they didn't go and see that it was put on the books, and this is the way it has been carried on for I'd say 20 years—well, maybe not that long, ever since Ralph Freeman bought it, this has been divided up and we're not talking about this particular property, we're talking about it with other property.

Q. I hand you herewith this statement and ask you to read it, from Exhibit E from the Bill, please?

A. This follows the description in a deed—I didn't check it, I believe I might as well mention it—make a statement about that—I'm glad I can read this first, this is after the description—it says 'there is hereby conveyed by this instrument and intended to be conveyed a total of 217.50 acres, more or less'—I do not know if it's in the record—there is in this deed—

Q. Before you leave that, though, you, as the draftsman of that instrument, were you thoroughly convinced that you were conveying 217 acres to these people?

A. Yes; I had the survey in front of me.

Q. And that's what they were buying, and that's what you thought you were conveying to them? On behalf of Mr. McMurtry?

A. I might add that the reason that survey—back when there was a Federal Land Bank Loan on it—was brought about by a discrepancy on the tax books, I had to approve a loan either to Metropolitan or Federal Land Bank and that's when we had to have a survey, to know what they were getting; and that sur-

vey showed 217." (Vol. 1, B. of E. pp. 61, 62, 63)

The evidence also shows that prior to the commencement of negotiations between complainants and defendants, the defendant, Mr. McMurtry, was told by a surveyor that one of the boundary lines on the survey of his property was actually 526 feet shorter than the line which was called for by the survey. Neither the defendants nor anyone else, so far as this record discloses, communicated this information to the complaints prior to consummation of the sale.

At some time during the fall of 1969, when Mr. Delforge went to the local ASCS office for the purpose of inquiring about application for a feed grain allotment for the farm, he received some information which caused him to doubt that the farm contained 217.5 acres and finally, in January, 1970, they employed a surveyor, one Howard L. Tabor, to survey the property and from his survey, it was conclusively ascertained that the farm contained only 159.5 acres, thus showing that the farm was 58 acres short of what the complainants were told they were purchasing.

It appears from Mr. Tabor's testimony that no particular parcel of land can be identified as representing the shortage of 58 acres and he explained the shortage in the following testimony:

"Q. Now, after you made this survey here for Mr. Edmonds and Mr. Delforge, and you came up with an acreage there of—how much was it—159.6—and applying that to this plat here that you further made, that taking the description from Mr. McMurtry's deed of 262 acres, and then taking off the 44.5, you subtract the acreage, and you have 217.5, but when you come up with your survey of 159.5, where did the land go? What was it? What happened to it? How did that come about? Where did the land go?

A. It's on the south end, a difference in the lines on the south of the dam,

there's an area of several acres in McEwen's property—

Q. You mean Erwin?

A. Mr. Erwin's property; and back on the west on Thomas' property and on the north in the general area of Parker's property, there's some variation shown there, there is also a difference in terms of acreage, and that's indicated in Mr. McMurtry's deed as—according to Mr. Sanders' calls, if I understand this survey, I come up with a different acreage on this particular plat, as platted from Mr. McMurtry's deed to that that's shown on this plat, the 262 acres, so there is a variation there, a variance, and there's a variance in that and a variance around the edges of the property." (Vol. 2, pp. 46, 47 B. of E.)

Of course, the case comes to us on this appeal for review pursuant to provisions of T.C.A. 27–303, which requires us to review the record de novo with the usual presumption that the decree of the trial Court is correct unless the preponderance of evidence is otherwise.

After carefully reviewing all of the evidence in this case, we are thoroughly convinced that the complainants intended to purchase and the defendants intended to sell a farm consisting of 217.5 acres, with a possible variance in either direction of not more than three per cent.

"The deed is only the execution of the contract, and the real contract and understanding between the parties in this respect will govern on the question."

Caughron v. Stinespring (1915) 132 Tenn. (5 Thompson) 636 at page 644 [179 S.W. 152] and cases therein cited.

"And it is the contract of sale, not the deed, which must determine whether the sale is by the acre or in gross." Myers v. Lindsay (1880) 73 Tenn. (5 Lea) 331 at page 335.

We are also thoroughly convinced that the complainants would not have agreed

to pay $51,800.00 for this farm if they had known it did not contain at least 200 acres.

The facts and circumstances of this case are different in material respects from those in any of the cases which have been cited or which we have been able to find by independent research, with the possible exception of Caughron v. Stinespring, supra, but it is not necessary for us to burden this opinion by summarizing the facts in all such cases.

■ As this Court said in Acuff v. Allen (1945), 28 Tenn.App. 451, 191 S.W.2d 196, the facts of each case should govern the matter and determine whether the purchaser is entitled to recover for a deficiency in the sale of land.

■ By the peculiar facts and circumstances of this case we are convinced that the sale of this farm was by the acre, instead of in gross, regardless of the fact that the parties did not agree upon a certain price per acre and then multiply that unit price by the total number of acres intended to be conveyed. When the seller and purchaser agree upon a certain sum of money for a certain number of acres, this constitutes a sale by the acre.

We think the basic rule governing a transaction of this kind is found in the following statement from C.J.S.:

"When the sale is by the acre *or specified quantity, so that the quantity or number of acres specified is of the essence of the contract*, the purchaser, although there is no covenant to that effect, but especially if there is, is generally entitled to an abatement of the purchase price for a deficiency in the quantity intended to be sold, although the description of the quantity is qualified to indicate that there might be more or less land than the quantity stated. However, in the latter case, no abatement will be allowed for a slight deficiency or variance which is fairly imputable to errors in survey or measurement, even if the sale is strictly by the acre and the purchaser is as familiar with the land as the vendor, and facts show that the contract would have been consummated if the shortage had been known in advance. If the purchaser gets all the land he is entitled to by a conveyance according to long established division fences, he is not entitled to a reduction because an actual survey shows a boundary which includes less land than the boundary fixed by the old division fences." (Emphasis supplied.) Vol. 92 C.J.S. Vendor & Purchaser § 266(1), pp. 135, 136.

■ The addition of the words "more or less", will not deprive the purchaser of his remedy where the seller represented as a fact, and not by way of opinion, that the land contained a certain number of acres. Breast v. Waddell (1911), 2 Tenn.Civ.App. 544 at page 548.

The evidence clearly establishes that the quantity or number of acres was of the essence of this contract and although it is not so stated in the trial Court's memorandum opinion or decree, we think that Court held that the sale was by the acre, instead of in gross, and awarded complainants a recovery upon that basis.

■ But, be that as it may, a correct result was reached on the question of complainants' right of an abatement of the purchase price and we cannot reverse that portion of the trial Court's decree by which this question was determined simply because it may have been predicated upon an erroneous reason.

In Barfield v. Insurance Company of North America (1968), 59 Tenn.App. 631, 443 S.W.2d 482, this Court held that we could not reverse the trial Court's decree because a correct result was reached and it has been held that where the trial Court reached a correct result but upon an erroneous reason, the Appellate Court will sustain the decree upon which it conceives to be the correct theory. Citing Cannon Mills, Inc., v. Spivey et al. (1961), 208 Tenn. 419, 346 S.W.2d 266; Sheafer v. Mitchell (1902), 109 Tenn. 181, 71 S.W. 86, and

Shutt v. Blount (1952), 194 Tenn. 1, 249 S.W.2d 904.

For the foregoing reasons, the first assignment of error is respectfully overruled.

However, we think the Chancellor committed error in determining the amount to be awarded to the complainants and this error is made the basis of the second assignment.

The following language in the trial Court's decree shows the manner by which this amount was determined:

"However, the bill prays for a reformation of the contract of sale of defendants to complainants, so as to correctly show the property actually conveyed, and that the purchase price be reduced, on a per acre basis in an amount equal to the shortage, and the Court having found as a fact that the complainants did not get 58 acres they were entitled to, the Court divides the $51,800 consideration paid by the 217.5 acres purchased, resulting in an average price of $238.16 per acre, and multiplies this average price by the 58 missing acres, resulting in a product of $13,813.28, which is the amount the Court finds to be the loss suffered by complainants by reason of the 58-acre shortage, and the amount by which the consideration paid by them for the land should be reduced." (Tech.Rec. p. 86)

This same question as to the amount to be awarded arose in Tinsley v. Hearn (1916), 136 Tenn. (9 Thompson) 586, 191 S.W. 127. In that case, the trial Court awarded an abatement of the purchase price for an acreage deficiency and the method used by the trial Court in arriving at the amount awarded was made the basis of an assignment of error. In considering that assignment of error the Supreme Court said:

"The chancellor, however, decreed an allowance for the deficiency in favor of the purchaser on the basis of the average value of the acreage, improved and unimproved, in the entire tract; and this is complained of by the appealing vendors, who insist that, as there were valuable improvements on the land which the purchaser undoubtedly took over, this fact should have been taken into consideration, and that the purchaser's right in any abatement is to actual compensation, not necessarily an abatement in price proportionate to the deficiency.

We think there is merit in this insistence. The purchaser was not mistaken or disappointed in respect to the improvements. The residence and outhouses were seen by him, and he concedes in his testimony that they had a considerable value. The failure to get some of the land he bought must therefore have reference to the portion on which the improvements were not located, and the true criterion of abatement is not the ratio of the quantities, represented and real." (Supra, pp. 588, 589, 191 S.W. p. 127)

\*    \*    \*    \*    \*    \*

"In determining the amount of the abatement, the value of the improvements should be fixed, of course, as of the date of the sale in their condition at that time; but boundary fences should not be considered for obvious reasons." (Supra, p. 591, 191 S.W. p. 128)

In the instant case, as in Tinsley v. Hearn, supra, the complainants inspected the residence and outbuildings and it is conceded that all such improvements were included within the boundaries of the land to which they actually acquired title and right of possession by their deed.

There is material and uncontroverted evidence in the record which establishes that at the time of sale these buildings had a value of $25,000.00 and therefore this amount should be deducted from the purchase price of $51,800.00 for the purpose of determining the average price per acre which the complainants paid for the 58 acres they did not get.

When this deduction of $25,000.00 is made from the purchase price this leaves a remainder of $26,800.00, or average price of

$123.22 per acre for unimproved land. When this average price per acre is multiplied by 58 we get a product of $7,146.76 and this is the amount which the Chancellor should have awarded to the complainants instead of $13,813.28.

Therefore, to this extent, the second assignment of error is sustained, the trial Court's decree is so modified and a decree will be rendered here in favor of complainants and against defendants in the sum of $7,146.76, together with all of the costs accrued in the trial Court, and the case will be remanded to the trial Court for enforcement of this decree and such further proceedings, consistent with this opinion, as may be necessary and proper.

The costs of this appeal will be borne equally by the parties, that is, the complainants will pay one-half of such costs and the defendants will pay the remaining one-half thereof.

SHRIVER, P. J., and TODD, J., concur.